UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ANTHONY MARTINO, an Illinois citizen; | ) | |
| | ) | |
| | ) | No. 1:20-cv-02267 |
| Plaintiff | ) | |
| | ) | Judge Virginia Kendall |
| v. | ) | |
| | ) | Magistrate Judge Susan Cox |
| THE ORCHARD ENTERPRISES, INC., | ) | |
| a Delaware corporation; INDEPENDENT | ) | |
| ONLINE DISTRIBUTION ALLIANCE, INC., a | ) | |
| California corporation; and MEDIANET, INC., a | ) | |
| Delaware corporation | ) | |
| | ) | |
| | ) | |
| Defendants | ) | |

## PLAINTIFF'S SECOND AMENDED COMPLAINT AT LAW

Pursuant to Rule 15(a)2 and the written consent of Defendants, ANTHONY MARTINO,

hereby brings this Second Amended Complaint and jury demand against Defendants THE

ORCHARD ENTERPRISES, INC., INDEPENDENT ONLINE DISTRIBUTION ALLIANCE,

INC., and MEDIANET, INC., based on Defendants' direct, contributory, and vicarious

infringements of Plaintiff's rights to his copyrighted musical works and sound recordings

pursuant to Section 106(1), 106(3), 106(4), 106(5) and/or 106(6) of the Copyright Act, 17 U.S.C.

§§ 101 et seq. (the "Copyright Act" or "Act"), and Defendants' deliberate scheme to conceal,

withhold, and deprive Plaintiff of royalties.

## NATURE OF THE ACTION

1.     This is a matter for Direct Copyright Infringement, Contributory Copyright

Infringement, Vicarious Copyright Infringement, Failure to Pay Royalties,

Conversion of monetary sums (i.e. royalties), and Conversion of intangible sound

1

recording-ownership royalty rights of which are directly connected and merged with Plaintiff's tangible personal property and written instruments.

2.     Plaintiff is the sole copyright owner of the authorship (i.e. composition of words and music), publishing rights, and sound recordings respective to 11 separate original songs comprising a non-dramatic musical "album", all of which are registered with the U.S Copyright Office as Registration # SRu628-333 (effective date of registration 7/31/2006)[1]. The album was titled "Hope In Isolation" (hereafter "HII Album") and released under the stage name "The Martino Conspiracy." See Certificate of Registration #SRu628-333 hereto as **EXHIBIT A**.

3.     Section 106 of the Copyright Act provides the owner of a copyrighted musical work with the exclusive rights to reproduce, prepare derivative works, distribute, perform, display, and also to authorize the reproduction, derivative work, performance, display and distribution of the musical works in "phonorecords" (i.e., audio-only copies). 17 U.S.C. § 106(1), (106(2), 106(3), 106(4), 106(5). Section 106 of the Copyright Act further provides the owner of a sound recording the exclusive right to perform the copyrighted work publicly by means of a digital audio transmission. 17 U.S.C. § 106(6).

4.      Generally, a party interested in reproducing and distributing the musical compositions embodied in the phonorecords can enter into a voluntary mechanical license with the copyright owners on terms the parties negotiate. Alternatively, under certain circumstances, a party can also obtain a license under the compulsory license

---

[1] Copyright law recognizes two separate and distinct copyrights in the recording of every song: the copyright in the underlying composition (music and lyrics) and the copyright in the sound recording of the performance itself. Plaintiff's certificate of registrations as referenced herein this Complaint encompass both copyrights.

provisions embodied in Section 115 of the Copyright Act. 17 U.S.C. § 115.

5.      Under Section 115, once the copyright owner authorizes the first public distribution of a musical composition, a statutory license is available to others to reproduce and distribute the musical work to the public, provided that they comply with the provisions of Section 115 requiring notice of use and accounting and payment of royalties to the copyright owner—in this instance, to the Plaintiff.

6.      In 1995, Congress enacted the Digital Performance Right in Sound Recordings Act ("DPRA"), which amended Section 115 to clarify and confirm the rights of reproduction and distribution for sound recordings and musical compositions in the digital age. In the DPRA, Congress recognized that a phonorecord of a musical work could be digitally reproduced and transmitted, and that copyright owners must be compensated for those activities. Thus, Section 115 was amended to include a definition of "digital phonorecord delivery" ("DPD") as "each individual delivery of a phonorecord by digital transmission of a sound recording which results in a specifically identifiable reproduction by or for any transmission recipient of a phonorecord of that sound recording, regardless of whether the digital transmission is also a public performance of the sound recording or any nondramatic musical work embodied therein." 17 U.S.C. § 115(d). Accordingly, the reproduction and distribution of musical works in the form of DPDs is subject to licensing and payment of royalties under Section 115, and as such, Plaintiff was entitled to royalties and monthly accounting under the Act for all digital distributions of his copyrighted musical works by Defendants.

7.      Generally, when a party makes a copyrighted musical composition available or distributes that composition before a license is obtained pursuant to Section 115, the

owner(s) of the mechanical rights to that musical composition (in this case, the Plaintiff) does not get paid.

8.      Moreover, making available and reproducing a musical composition without a license is copyright infringement under 17 U.S.C. § 501, and may not be cured after the fact by attempting to obtain a compulsory license.  See Section 115 ("failure to serve or file an NOI forecloses the possibility of a compulsory license and, in the absence of a negotiated license, renders the making and distribution of phonorecords actionable as acts of infringement . . .".)

9.      All of the named Defendants own and operate digital and/or physical sound recording distribution services subject to Section 115 of the Act.

10.     Furthermore, unlike musical compositions of which are subject to Section 115 of the Copyright Act, a party interested in reproducing and distributing a master sound recording embodying a given performed musical composition, must first negotiate and obtain a master license from the sound recording's copyright owner—in this instance, the Plaintiff. Defendants intentionally failed to do so before reproducing and distributing his master recordings to the general public and to other third-parties, and as a proximate result, Plaintiff has lost control over both the distribution and performances of his copyrighted sound recordings, as well as the ability to negotiate royalty rates on the sales of the recordings.

11.     In February and March of 2020, Plaintiff first discovered that Defendant Independent Online Distribution Alliance, Inc. (hereafter "IODA"), and Defendant The Orchard Enterprises, Inc. (hereafter "THE ORCHARD"), have reproduced and

distributed (via an unauthorized license) each one of Plaintiffs' 11 copyrighted compositions/sound recordings on the HII Album as encompassed within Plaintiff's Certificate of Registration #SRu628-333 (EXHIBIT A) to a third-party music distributor and licensor (Defendant MEDIANET, INC.), and upon information and belief, to third-party non-interactive music webcasters (Last.Fm, and Live365), to an interactive music streaming provider (Gaana.com), and to other currently unknown third-parties. IODA and THE ORCHARD have intentionally done so without obtaining any compulsory license, without negotiating and obtaining a master recording license from Plaintiff, and without having ever served any Notice of Intention to Obtain a Compulsory License ("NOI")—either to Plaintiff, or to the U.S. Copyright Office—before reproducing, distributing, and/or licensing said sound recordings to third-parties.

12.      On or about March 2nd, 2020, Plaintiff first learned that Defendant MediaNet, Inc. (hereafter, "MEDIANET") is one of the direct recipients of THE ORCHARD'S unlawful reproductions and distributions of Plaintiff's 11 copyrighted compositions/sound recordings as referenced on Exhibit A hereto, and that upon its receipt of the reproduced sound recordings from THE ORCHARD, MEDIANET itself uploaded each recording onto its own computer servers and then reproduced, distributed, and/or otherwise made available (via sub-licensing agreements) new digital MP3 copies of each song to at least 53 (but currently believed to be over 60) separate third-party brick and mortar music retail stores located across the United States of which are listed on **<u>EXHIBIT B</u>** hereto within the 3-year period immediately preceding the filing of this lawsuit.

13.      Each third-party retailer listed on Exhibit B hereto was/is independently selling

and/or has already sold to the general public through their respective interactive online websites (without any geographic buying and downloading restrictions for U.S customers), including to residents of Illinois, each one of Plaintiff's 11 sound recordings on the HII USC § 115(e)(24)), and also as a full 11-song permanent MP3 album for $9.99.

14.     MEDIANET has intentionally reproduced, distributed and/or made available through sub-licensing agreements, Plaintiff's 11 sound recordings on the HII Album to each of these 53 (or more) third-party retailers without obtaining any mechanical license, without ever negotiating or obtaining a master recording license from Plaintiff, without ever paying any royalties to Plaintiff from resulting sales, and without bothering to have ever served any Notice of Intention to Obtain a Compulsory License ("NOI")—either to Plaintiff, or to the U.S. Copyright Office—before reproducing distributing, and/or licensing said recordings.

15.     In March of 2020, Plaintiff also first learned that in addition to the 11 copyrighted compositions/sound recordings on the HII Album as referenced on Exhibit A, MEDIANET has also by some unknown means, obtained and uploaded into its internal music catalogue on its computer servers, the master recordings to 10 additional original songs of which Plaintiff is the sole copyright owner of the authorship (i.e. composition of words and music), publishing rights, and sound recordings comprising a non-dramatic musical "album" as registered with the U.S Copyright Office as Registration # SRu982-184 (effective date of registration 6/10/2009). The album of 10 songs was titled "Slightly Defined" (hereafter "SD Album") and released under Plaintiff's name "Tony Martino." See Certificate of Registration # SRu982-184 hereto as **EXHIBIT C**.

16.     MEDIANET then reproduced, distributed and/or otherwise made available (via
sub-licensing agreements) its digital MP3 copies of each one of Plaintiffs' 10 recordings
on the SD Album to at least the same 53 separate third-party music retailers as
identified on EXHIBIT B hereto within the 3 year period immediately preceding the
filing of this lawsuit, and all 53 of which are independently selling and/or have already
sold to the general public through their respective interactive online websites (without
any geographic buying and downloading restrictions for U.S customers), including to
residents of Illinois, each one of Plaintiff's 10 sound recordings individually as digital
MP3's for $0.99 each (i.e. "Permanent Downloads" as defined in 17 USC § 115(e)(24)),
and also as a full 10-song permanent MP3 album for $9.99—prices of which
MEDIANET set on its own accord.

17.     MEDIANET has intentionally reproduced, distributed, and/or made available via sub-
licensing, Plaintiff's 10 sound recordings on the SD Album to each of these 53 third-
party retailers, without obtaining any mechanical license, without ever negotiating or
obtaining a master recording license from Plaintiff, without ever paying any royalties to
Plaintiff, and without bothering to have ever served any Notice of Intention to Obtain a
Compulsory License ("NOI")—either to Plaintiff, or to the U.S. Copyright Office—
before reproducing distributing, and/or sub-licensing said recordings.

18.     Upon information and belief, all of the named Defendants in this suit
derived/derive a direct financial benefit from the third-parties it has reproduced and
distributed/distributes Plaintiff's recordings to, in the form of, inter alia, upfront or
ongoing licensing fees, a percentage of any sales on the permanent downloads (i.e.
mechanical royalties), and/or from digital performance royalties collected and distributed

by SoundExchange, the non-profit collective rights management organization that is designated by the U.S. Congress as the sole organization to collect and distribute digital performance royalties for the non-interactive use of sound recordings under the statutory licenses set forth in 17 U.S.C. § 112 and 17 U.S.C. § 114.

19.     In addition to each Defendant having failed to ever negotiate and obtain a master recording license from Plaintiff as the sound recording copyright owner, all of the Defendants were also required to serve an NOI pursuant to Section 115 of the Copyright Act, in the form proscribed by 37 CFR § 201.18, 30 days after making Plaintiffs' copyrighted recordings available and prior to distributing them. Defendants again unanimously failed to do so.

20.     So as to further conceal their past and ongoing infringements of Plaintiff's copyrights, each Defendant has also deliberately failed to serve Plaintiff with any Monthly and Annual Statements of Account as required by Section 115 of the Copyright Act, and as such, have failed to pay any royalties to Plaintiff as generated from their unauthorized reproductions, distributions, and resulting sales (including sales willfully allowed to be made to Illinois residents by certain parties named on Exhibit B hereto), while at the same time, directly profiting off the infringing sales.

21.     Finally, since approximately February of 2018, Defendants IODA and THE ORCHARD, as a merged business operation (DBA as "THE ORCHARD"), have intentionally deprived Plaintiff of his right to collect past and future sound recording rights-ownership royalties generated by digital audio performances of at least 3 of Plaintiff's songs—"Note To Self", "Love Extinguisher" & "Moat Around Your Heart" (hereafter "3 Disputed Songs")—of which are each individually identified on Exhibit A

hereto as part of the HII album. Defendants have accomplished this fraudulent objective by filing a false sound-recording "rights ownership" (RO) claim directly with SoundExchange for each of the 3 Disputed Songs, and then at all times since Plaintiff's discovery, have refused to relinquish its fraudulent sound recording rights ownership claim despite numerous demands to do so from Plaintiff.  As a result of this overlapping dispute concerning the sound recording rights ownership on the 3 Disputed Songs, SoundExchange has jointly alerted IODA, THE ORCHARD, and Plaintiff nearly every week since February of 2018, that any and all future royalties that have been or could be generated from digital audio performances of Plaintiff's 3 songs, will be held indefinitely in escrow until the sound recording rights-ownership dispute is first resolved—thus constituting Defendant IODA and THE ORCHARD'S conversion of Plaintiff's royalty rights in his own sound recordings and causing Plaintiff significant emotional distress.

22.     All of Defendants' acts and omissions alleged herein by Plaintiff were first discovered by Plaintiff within the three-year period immediately preceding the filing of this lawsuit, and could not be reasonably discovered any sooner due to Defendants' intentional concealments of their reproductions and distributions; their unanimous failure to comply with numerous parts of Section 115 of the Copyright Act and to pay royalties; the fact that certain recipients of Defendants' unauthorized reproductions and distributions are located in foreign countries, and as such, their uses of Plaintiff's copyrighted works were/are not readily locatable through basic U.S-based keyword searches; the fact that none of the 53 separate third-party music retailers (as identified on Exhibit B hereto) of whom have received Defendant MEDIANET'S unauthorized distributions and are selling Plaintiff's recordings have their respective online websites

searchable using Plaintiff's name or the titles of Plaintiff's copyrighted works via basic

keyword searches on the Internet; and also, upon information and belief, because

Defendants' unlawful distributions did not occur simultaneously, but rather, at unknown

separate points in time within the three-year period preceding this suit, and potentially

even prior to the three-year period preceding this suit of which were at all times unknown

to and/or otherwise hidden from Plaintiff.

## **PARTIES**

23.     Plaintiff, Anthony Martino (aka "Tony Martino"), is an individual and resident of

the state of Illinois. Plaintiff was and is a professional singer/songwriter and self-funded

recording artist. Between 2003 and 2011, he independently licensed numerous of his

original songs into television shows on major media networks (CBS, MTV, SyFy, etc.)

and other commercial uses; obtained national press (NY Times, Wall Street Journal, etc.);

played live shows throughout the U.S with a hired accompanying band; and garnered

national radio airplay for his original songs across the U.S on various terrestrial radio

formats (commercial and non-commercial radio stations). He was also specifically

selected by ASCAP ("American Society of Authors and Composers") to participate in

various highly exclusive public and private events based solely on its recognition of his

musical compositions and production abilities. Between approximately early 2011 and

late 2016, Plaintiff was on near-complete hiatus from the music industry due to a

significant and unexpected medical injury, before resuming his career in mid-2017.

Plaintiff has also worked substantially as a fraud investigator (civil and criminal matters)

and possesses the following professional designations and educational credentials (CFE,

FCLS, PCLS, HCAFA & MBA).

24.      Defendant, The Orchard Enterprises, Inc. ("THE ORCHARD"), is a Delaware

Corporation and wholly-owned subsidiary of SONY Music, that distributes music and

video through national digital and Internet retailers, national brick and mortar retail

stores, and national mobile carriers, on behalf of record labels, recording artists, music

publishers, film and television outlets, and other business entities or persons. It has its

principal place of business in New York, New York.

25.      Defendant, Independent Online Distribution Alliance, Inc. ("IODA"), is a

California corporation and wholly-owned subsidiary of SONY Music in New York that

provides various distribution, marketing, publishing and administrative services to

selected independent record labels, physical distributors, video companies, recording

artists, filmmakers, print media publishers and independent authors, including license

negotiations, media encoding and metadata management, royalty payment administration

and reporting, and marketing and promotional support. It shares its principal place of

business in New York, New York with THE ORCHARD.

26.      Upon information and belief, IODA and THE ORCHARD ENTERPRISES, INC.

merged business operations at some point during 2012 and now currently do business

jointly as "THE ORCHARD", but still continue to function as separate legally-active

business entities, but with THE ORCHARD ENTERPRISES, INC. being the successor

in interest to all of IODA's rights and obligations preceding the merger.

27.      Upon information and belief, Defendant MediaNet, Inc. ("MEDIANET") was and

is a Delaware corporation with its principal place of business located at 1601 5th

Avenue, Suite 1100, in Seattle, Washington.  MEDIANET is a business to business

licensor of certain rights in its music catalogue, of which it publicly advertises on its

website (www.mndigital.com) as currently containing "over 68 million recordings". Upon information and belief, it obtains songs for its growing catalogue of music directly from record labels and other music distributors through licensing agreements it enters into therewith. It then enters into licensing/sub-licensing agreements with various third-party music retailers located across the United States of which allows such retailers to offer the sound recordings from MEDIANET's internal music catalogue as permanent digital downloads for sale to the general public (without geographic restrictions in the United States) in exchange for upfront licensing fees, a percentage of sales, or some other financial or business benefit.

27(a)    Upon information and belief, MEDIANET is also an agent of THE ORCHARD via contractual arrangement, and also by way that THE ORCHARD has the right and ability to control MEDIANET'S reproductions, distributions and/or sublicensing of the content it directly provides to MEDIANET.

## JURISDICTION AND VENUE

28.    This Court has exclusive jurisdiction of this matter pursuant to 28 U.S. Code § 1338 because it involves claims of Copyright Infringement.

29.    This Court has supplemental jurisdiction of Plaintiff's state law claim pursuant to 28 U.S. Code § 1367(a).

30.    Jurisdiction is also proper in this Court pursuant to 28 U.S.C. §1332(a), because the Plaintiff and the Defendants are citizens of different states and the amount in controversy exceeds $75,000.

31.    Venue of this action is proper in this District pursuant to 28 U.S.C. § 1391(b) and 1400(a) because a substantial part of the events giving rise to the claim occurred in this

District. Venue is also proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(c) and 1400(a), because Defendants are "residing" in this District, and because Defendants are subject to personal jurisdiction in this District.

32.     This Court has personal jurisdiction over the Defendants pursuant to 735 ILCS 5/2-209(1)(2)(7) & (10) (Illinois' Long-Arm Statute) for the following reasons: All of the Defendants have continuously been "conducting" and "transacting business" in this judicial district both prior to and following all of the acts and omissions alleged herein by the Plaintiff, such as by distributing sound recordings and other products or services to and from this judicial district, including violating Sections 106 & 501 of the Copyright Act by intentionally reproducing and distributing copies of Plaintiff's sound recordings to certain third-party brick and mortar retailers located in Illinois of whom have made such sound recordings publicly available for sale within Illinois and elsewhere within this judicial district and across the United States without paying any royalties or providing any accounting to Plaintiff in conjunction with sales; Defendants IODA and THE ORCHARD (as a merged business operation) have regularly solicited employment opportunities to the members of the general public residing within Illinois and elsewhere within this judicial district so as to purposefully market Defendant's services, products and/or business partners within this state and judicial district, and upon information and belief, have actually hired residents of the general public within Illinois and elsewhere within this judicial district to perform such purposes; All of the Defendants regularly enter into distribution contracts and other contracts with persons and business entities that are incorporated and principally based in Illinois and elsewhere within this judicial district including record labels, musicians, and retail stores for the purposes of transacting

business in and from this state, including business of which actually involved/involves the sale of Plaintiff's sound recordings to and from Illinois and elsewhere within this judicial district and other judicial districts; and also because Defendants IODA and THE ORCHARD have purposefully acquired, through conversion, actual monetary funds (i.e. royalties), as well as control of royalty rights for three of Plaintiff's songs of which are directly connected with Plaintiff's tangible personal property and written instruments (i.e. sound recordings and associated certificate of registrations validating legal authorship and copyright ownership) of which are/were at all times situated in the state of Illinois when Defendants acquired and maintained such control, and in fact, Defendants have unjustly enriched themselves through such conversion while continuing to deprive Plaintiff. Furthermore, at all relevant times herein, all of the named Defendants had actual and constructive knowledge that Plaintiff was/is an Illinois resident, and thus, that this Court could exercise personal jurisdiction in light of their deliberate actions both directed at this state and felt by Plaintiff in this state. As such, this Court's exercise of jurisdiction over these Defendants will not offend traditional notions of fair play, due process, and substantial justice.

33.  Plaintiff has the right to bring this action pursuant to 17 U.S.C. § 501(b).

34.  The copyright in every musical composition and sound recording at issue were registered in the United States Copyright Office prior to the filing of this matter, and therefore, satisfy the registration requirements as set forth in 17 U.S.C. § 411(a).

35.  Each of the 11 copyrighted works (i.e. songs) comprising the HII album and each of the 10 copyrighted works comprising the SD album have an independent economic value.

36.     All of Plaintiff's copyrights were also registered with the United States Copyright Office prior to all of the Defendants' infringements, thereby entitling Plaintiff to an election of statutory damages per each work separately infringed, as well as attorney's fees (if incurred by Plaintiff in this action).

37.     Plaintiff has never before filed a lawsuit concerning any of the copyrighted works referenced herein this complaint, nor has Plaintiff ever before filed a lawsuit of which involves any of his intellectual property in general.

38.     Pursuant to 17 U.S.C. §502, Plaintiff is also entitled to injunctive relief.

**FACTS SPECIFIC TO PLAINTIFF'S "HII" ALBUM (EXHIBIT A HERETO)**

39.     Between approximately February of 2005 and mid-2006, Plaintiff self-funded the professional recording, mixing, and mastering of the "HII Album" (Exhibit A hereto) on a budget of approximately $77,000 (or $7000 per song), including personally selecting, scheduling, and overseeing all of the different recording studios/locations, guest musicians, studio musicians, and recording and mastering engineers that participated in the entire scope of the project, and as such, Plaintiff was the "producer" of the album.

40.     On or about 12/13/2006, Plaintiff entered into a formal "distribution-only" agreement with Aspirion Records Group, Inc., a record label corporation based in Nashville, Tennessee (hereafter "ASPIRION"), of which expressly permitted Aspirion the exclusive right to, inter alia, distribute the HII Album to brick and mortar as well as Internet-based physical and digital retailers specifically and solely through third-party, Navarre Corporation (hereafter "NAVARRE"), for a period of 1 year, with optional yearly renewals exercisable only by written notice from Plaintiff to Aspirion (hereafter, "Aspirion Distribution Agreement").

41.     Between approximately January of 2007 and December of 2007, ASPIRION—

through NAVARRE—distributed Plaintiff's HII Album to select digital

music retailers on the Internet in accordance with the Aspirion Distribution Agreement,

including to Apple iTunes, Amazon.com, Rhapsody, and eMusic.

42.      However, due to Aspirion being unable to fulfill its contractual obligation in

having NAVARRE also widely distribute the physical version (i.e. manufactured CD's)

of the HII Album into brick and mortar retail stores as explicitly called for and promised

under the Aspirion Distribution Agreement, said agreement was mutually terminated

between Plaintiff and Aspirion by approximately December of 2007, with Aspirion also

immediately sending multiple written "take-down" orders to all of the Internet-based

music retailers that Navarre had already digitally distributed the HII Album to during the

course of 2007, instructing such retailers to remove the album from their respective

websites.

43.     By approximately mid-2008, the majority (if not all) of the Internet music retailers

that had been selling the HII Album digitally in 2007 as distributed to them by

NAVARRE, had delisted the album from their retail websites as pursuant to the multiple

take-down orders sent by Aspirion.

44.     At no time, did Plaintiff ever contract with or authorize any named Defendant in

this matter to perform distribution or licensing services regarding any of the 11 musical

works/sound recordings comprising the HII Album as set forth on Exhibit A hereto.

45.     At no time, did Plaintiff ever contract with or authorize any other music distributor or

licensor (other than NAVARRE pursuant to the Aspirion Distribution Agreement as

previously referenced herein) to perform distribution or licensing services regarding

any of the 11 musical works/sound recordings comprising the HII Album as set forth on Exhibit A hereto.

**FACTS SPECIFIC TO PLAINTIFF'S "SD" ALBUM (EXHIBT C HERETO)**

46.    Between approximately January of 2008 and mid-2009, Plaintiff self-funded the professional recording, mixing, and mastering of the "SD Album" (Exhibit C hereto) on a budget of approximately $60,000 (or $6000 per song), including personally selecting, scheduling, and overseeing all of the different recording studios/locations, guest musicians, studio musicians, and recording and mastering engineers that participated in the scope of the project, and as such, Plaintiff was the "producer" of the album.

47.    On or about 11/5/2009, Plaintiff entered into a (paid) subscription distribution agreement with Ditto Music, LTD, an online music distribution provider based in London, United Kingdom (hereafter "DITTO"), of which permitted Ditto the right to distribute the SD Album to various digital music retailers on the Internet in which it was partnered with.

48.    Ditto distributed the SD album to select digital music retailers on the Internet between approximately December 1st, 2009 and March 16th, 2010, including Vidzone, Amazon.com, Rhapsody, Play.com, and Moozone.com.

49.    However, due to Plaintiff's sudden and unexpected medical injury (as referenced in paragraph 23 herein) of which forced Plaintiff to indefinitely postpone the planned marketing of the SD album, the distribution subscription agreement with Ditto was mutually cancelled on or about March 17th, 2010, and the SD Album shelved.

50.    Between March 17, 2010 and July 1st, 2010, Ditto (via Lee Parsons and Jay Kerr) sent numerous formal "take down" requests to all of the digital music retailers and other

parties that it had already distributed the SD Album to on the Internet, and all such retailers had completely delisted the album from their websites by approximately August 1st, 2010.

51.     At no time did Plaintiff ever contract with or authorize any Defendant in this matter to perform distribution or licensing services regarding any of the 10 musical works/sound recordings comprising the SD Album as set forth on Exhibit C hereto.

52.     At no time did Plaintiff ever contract with or authorize any other party (other than Ditto as previously referenced herein) to perform distribution or licensing services regarding any of the 10 musical works/sound recordings comprising the SD Album as set forth on Exhibit C hereto.

## FACTS SPECIFIC TO PLAINTIFF'S REGISTRATION OF THE "HII" ALBUM WITH SOUNDEXCHANGE

53.      SoundExchange is a non-profit collective rights management organization. It is designated by the Librarian of Congress as the sole organization designated by the U.S. Congress to collect and distribute digital performance royalties for sound recordings on behalf of the featured artists of the recordings (typically band members or the name of the recording artist), the non-featured artists of the recordings (typically studio musicians participating on the recording but not actual members of the band), and the sound recording rights owners (typically the registered copyright owner of the sound recording). SoundExchange pays these three different groups "digital performance royalties" for the non-interactive use of sound recordings in accordance with the statutory licenses set forth in 17 U.S.C. § 112 and 17 U.S.C. § 114.

54.     "Digital performance royalties" are fees that all Internet and satellite radio companies (for example, Pandora and SiriusXM) as well as all other subscription and

non-subscription based webcasting companies, are required by law to pay to artists and sound recording rights holders via SoundExchange for having streamed musical sound recordings on their respective platforms. SoundExchange then collects and pays these received digital royalties to the respective featured and non-featured artists and sound recording rights owners, but only after it is first made aware who such artists and sound recording rights owners are in relation to a respective recording. Pursuant to statute, 45% of the digital performance royalties SoundExchange collects are paid directly to the featured artists on a sound recording, 5% are paid to a fund for non-featured artists, and the other 50% of the digital performance royalties are paid to the rights owners of the sound recordings.

55.     Typically, SoundExchange is only made aware of the identities of the featured artists and rights owners for any given sound recording when such featured artists and/or rights owners—sometimes the same person such as in Plaintiff's case—actually establish a free account with SoundExchange through its website, and then specifically claim a given sound recording to their respective SoundExchange account by denoting themselves as the featured artist of the sound recording, the rights owner of the sound recording, or both.

56.     In instances when SoundExchange receives payments from third-parties for digital performance usages of sound recordings in which it is unaware of whom the proper payee(s) is for the royalties, SoundExchange holds such funds in escrow for a certain period of time until such funds are eventually claimed by a featured artist and/or rights owner.

57.     On or about 1/22/2017, Plaintiff first became aware of SoundExchange and its

value to sound recording rights owners and featured artists such as himself, and therefore, created his account through SoundExchange's website.

58.     On February 13th, 2017, Plaintiff (for the very first time) submitted each of the 11 songs on the HII Album for registration with SoundExchange. In doing so, Plaintiff denoted on his registration submission that he was entitled to 100% of the Featured Artist royalties and 100% of the Sound Recording Rights royalties for each of the 11 songs on the album, which was/is consistent with his certificate of registration (Exhibit A) as the rightful copyright owner.

59.     On April 20th, 2017, a representative of SoundExchange informed Plaintiff that Plaintiff's registration submission for the HII Album had been received by SoundExchange, but that the sound recording royalties for the album had (unbeknownst to Plaintiff) already been paying out from SoundExchange to Defendant IODA, and questioned whether Plaintiff stood by his claim of being the proper rights owner of the sound recordings for the HII Album.

60.     Plaintiff re-confirmed for the SoundExchange representative that he was the proper sound recording rights owner for the entire HII Album and that IODA should never have been listed as the rights owner of the HII Album with SoundExchange. The representative then advised Plaintiff that SoundExchange's Rights Management Department would be looking into the situation and would get in contact with Plaintiff if anything further was needed.

61.     Between April 20th, 2017 and February 12th, 2018, Plaintiff received no further communications from SoundExchange concerning his registration of the HII Album.

62.     On February 13th, 2018, Plaintiff finally received a written email notification from

SoundExchange advising Plaintiff of an overlap dispute in that 3 of his songs from the HII Album—"Note To Self", "Love Extinguisher", and "Moat Around Your Heart" (the "3 Disputed Songs")—were already being claimed by IODA as the 100% rights owner of the sound recordings, and with THE ORCHARD being designated by IODA as the associated payee of the sound recording rights-owner royalties for the 3 Disputed Songs. Notably, the email stated the following: "The Rights Management department at SoundExchange oversees the repertoire claims of sound recording copyright owners (RO) for digital performance rights in sound recordings. In processing the claims for Anthony Martino, we identified specific tracks already associated with an RO account. When we notified the current payee [The ORCHARD] of the new claim for the track(s) in question, they maintained their own collection rights in some capacity; i.e., they do not agree that the digital performance royalties for the attached tracks should be adjusted to another rights owner. Thus, we need your help in resolving the overlapping claims. Regarding tracks for which you maintain your collection rights, we will alert both claimants in a separate dispute report once the 45-day period has concluded. We will then place any new revenue on hold for those specific tracks where both parties have continued to assert ownership. An additional message will be sent instructing all claimants that a resolution must now be reached externally and that all accruals for the noted track(s) will remain on hold, indefinitely, until the parties confirm a unanimous agreement. By making or verifying these claims, you represent and warrant to SoundExchange that you have the exclusive right to license and collect royalties for their public performance by means of digital audio transmissions. If you make or verify a claim that is false or incorrect, you may be subject to liability."

63.     SoundExchange's email of February 13th, 2018 further provided Plaintiff with an attached form with various questions to be filled out and returned back to SoundExchange within 45 days. Notably, the form sought a yes or no re-affirmation as to whether Plaintiff had/has the right to collect digital performance royalties for the sound recordings of the 3 Disputed Songs, and if yes, to designate a specific percentage (up to 100%) of the rights owner digital performance royalties that Plaintiff was attesting to being entitled to collect. In addition, the form allowed for Plaintiff to leave any additional comments or information next to each of the 3 Disputed Songs.

64.     Plaintiff returned the completed form back to SoundExchange on February 23rd, 2018. Thereon, Plaintiff re-affirmed that he had/has the perpetual right to collect 100% of the digital performance royalties as the featured artist and as the rights owner for the sound recordings of the 3 Disputed Songs of which SoundExchange collects. Plaintiff further noted on the form in the "Additional Comments" section, that he was the sole registered copyright author and owner of both the songs and the actual sound recordings.

65.     On June 27th, 2018, Plaintiff, IODA, and THE ORCHARD jointly received an email correspondence from the Rights Management Department of SoundExchange, stating in part: "Dear Rights Owners, While processing the claims of copyright owners (ROs) for digital performance rights in sound recordings, the Rights Management department at SoundExchange has identified tracks that have been claimed by multiple ROs. The attached excel report contains a list of tracks for which collection rights as the RO have been asserted by all parties on this correspondence. It's now the responsibility of the parties involved to resolve these disputes outside of SoundExchange. It's our policy to place revenue for these tracks on hold until an agreement is reached by all ROs.

Once a resolution has been settled among all parties, please 'reply all' to this notice, and we will handle the proper account adjustments. Please ensure all recipients of this notification are included in your response, as all parties must confirm the resolution before frozen revenue will be released. ***Be advised: as revenue is held indefinitely until all parties unanimously agree, within the attachments we've included tracks that have recently been placed on hold due to claims made by multiple parties, as well as those that have been sent on past reports that are still unresolved. By making or verifying these claims, you represent and warrant to SoundExchange that you have the exclusive right to license and collect royalties for their public performance by means of digital audio transmissions. If you make or verify a claim that is false or incorrect, you may be subject to liability. By accepting your claim, SoundExchange does not waive its or anyone else's right to recover damages incurred by virtue of your claim being false or incorrect and claims for other relief are expressly retained." Also attached to this same email, was the completed form that Plaintiff returned back to SoundExchange on February 23rd, 2018 of which contained the information provided by Plaintiff as specified in paragraph 62 herein.

### FIRST CLAIM FOR RELIEF – CONVERSION AGAINST DEFENDANTS IODA AND THE ORCHARD

66.     Plaintiff incorporates the statements and allegations contained in all of the preceding paragraphs as if fully set forth at length herein.

67.     At all times, Plaintiff was and is the rightful sole copyright author and sound recording owner of each of the 11 songs on the HII Album, including the 3 Disputed

Songs, pursuant to his certificate of registration (Exhibit A) hereto**2**. As such, at all

times Plaintiff was and is entitled to immediate possession of all economic rights in the 3

Disputed Songs, including the right to collect 100% of the sound recording rights-

ownership royalties as collected and paid by SoundExchange. Additionally, Plaintiff

was and is entitled to immediate possession of any and all digital performance royalties

already paid to IODA and/or THE ORCHARD by SoundExchange as it specifically

concerns the 3 Disputed Songs—even if only minimal—since any such royalty payments

made to Defendants were not authorized by Plaintiff as the copyright owner of the sound

recordings, and were otherwise unlawfully and unjustly obtained by Defendants.

68.      Upon receiving the written email from SoundExchange on June 27th, 2018 as

referenced in paragraph 65 herein, Plaintiff immediately (that same day) sent an email to

IODA and THE ORCHARD at two email addresses:

performanceclaims@theorchard.com and emoses@theorchard.com (belonging to Edward

Moses, an employee of the ORCHARD with the job title of "Associate Director of

Performance Rights Services").  Both email addresses were directly provided to Plaintiff

by SoundExchange, and in fact, were also directly emailed by SoundExchange itself as

specifically referenced in paragraph 65 herein.

68(a).      In his email, Plaintiff advised IODA and  THE ORCHARD that for "over a

decade," he's been the sole copyright owner of the sound recordings for the 3 Disputed

Songs, and inquired as to what Defendants' basis was/is for contesting his rights

ownership with SoundExchange.

---

2 Deposited with Plaintiff's original form SR paper submission to the U.S Copyright Office for the HII Album, was a physical copy of the actual master recordings of the album of which the Copyright Office maintains for reference and research purposes.

69.     IODA and THE ORCHARD deliberately ignored Plaintiff's email from June 27th, 2018 and provided no response thereto.

70.     Between June 27th, 2018 and November 12th, 2019, no further communications were sent to Plaintiff by SoundExchange in connection with the overlap dispute concerning the 3 Disputed Songs.

71.     Beginning on November 12th, 2019, SoundExchange began emailing both Plaintiff and THE ORCHARD weekly snapshots of all outstanding overlap disputes within their respective song repertoires as registered with SoundExchange. These weekly snapshots are called "Overlap and Disputes Digests", and of which requires the parties to advise SoundExchange as to whether or not they are maintaining or relinquishing their respective claims as to sound recording rights ownership of the 3 Disputed Songs. SoundExchange has generated this Overlap and Disputes Digest" to both parties (Plaintiff and THE ORCHARD) jointly by email each and every Tuesday since November 12th, 2019, and each of these weekly emails state exactly the following: "While processing the claims of copyright owners for digital performance rights in sound recordings, the Rights Management team at SoundExchange identifies overlapping claims made by registrants and works with the claiming parties to facilitate resolution. This notice provides a breakdown of Overlaps & Disputes information that can be accessed, around the clock, via your SoundExchange Direct (SXDirect) portal, within the My Catalog section.  In SXDirect you'll find: Summary and detail views of every recording for which you are involved in an overlapping claim with another rights owner; The current statuses of the overlaps (Confirmation/Reconfirmation/Dispute); The ability to take actions toward resolution."

72.     In response to each and every weekly "Overlap and Disputes Digest" that SoundExchange has generated to the parties, THE ORCHARD and IODA have dually advised SoundExchange that they are maintaining their position of being entitled to 100% of the sound recording rights ownership royalties on the 3 Disputed Songs. Plaintiff has also maintained the same position, thus, continuing the ongoing overlap dispute between the parties.

73.     Between February 16th, 2018 and December 10th, 2019, Plaintiff made numerous unsuccessful phone calls and written inquiries to various departments within SoundExchange in attempt to obtain information as to, inter alia, when specifically IODA first submitted the 3 Disputed Songs to SoundExchange for their initial registration with SoundExchange; whether or not IODA or THE ORCHARD had actually ever received any royalty disbursements from SoundExchange in connection with the 3 Disputed Songs; and when specifically IODA had assigned its (alleged) sound recording rights-ownership royalty payee-rights to THE ORCHARD through SoundExchange.

74.     On December 11th, 2019, Plaintiff also sent IODA and THE ORCHARD a certified letter to their principal place of business in New York, NY.  In the letter, Plaintiff attached his certificate of registration for the HII Album (Exhibit A), again advised both Defendants that he was the rightful copyright owner and entitled to immediate possession of the sound recording rights-ownership payee rights with SoundExchange for the 3 Disputed Songs, and also requested a basis for their continued dispute. Therein the letter, Plaintiff further demanded that IODA and THE ORCHARD immediately relinquish their sound recording rights-ownership claim with SoundExchange on the 3 Disputed Songs, immediately return any and all digital performance royalties ever

received from SoundExchange on the 3 Disputed Songs, and also to cease and desist any further distributions of Plaintiff's sound recordings.

75.     Plaintiff's certified letter further advised IODA and THE ORCHARD that their ongoing dispute (through SoundExchange) as to the sound recording ownership royalty rights on the 3 Disputed Songs has and continues to reasonably deprive Plaintiff of the ability to promote said songs to digital broadcast formats, and also that the situation was/is causing Plaintiff significant emotional distress. Plaintiff's letter instructed IODA and THE ORCHARD to provide a response within 10 business days of their certified receipt, and warned that Plaintiff may in fact take legal action in Cook County, Illinois if no response was received.

76.     Defendants received Plaintiff's certified letter on December 16th, 2019, but to date, have decided to completely ignore it without issuing any response whatsoever back to Plaintiff.

77.     On or about February 4th, 2020, Plaintiff finally spoke with an individual in SoundExchange's "Indies and Performers" division named Erin Clendaniel, of whom was willing to provide certain information to Plaintiff regarding IODA's initial registration of the 3 Disputed Songs with SoundExchange.

78.     Notably, between February 4th, 2020 and February 14th, 2020, Ms. Clendaniel made Plaintiff aware that IODA had first submitted the 3 Disputed Songs to SoundExchange for registration into SoundExchange's database in early June of 2012, and that in its submission, it claimed itself as the sound recording rights owner and entitled to 100% of any and all digital performance royalties collected by SoundExchange in perpetuity.

79.     Ms. Clendaniel further advised Plaintiff that in late June of 2012, IODA received its first royalty deposit from SoundExchange in connection with digital performance usages reported to SoundExchange on the 3 Disputed Songs by non-interactive Internet radio stations called Live365 and Last.fm of which date back to 2010.  According to Ms. Clendaniel, later in June of 2012 IODA then notified SoundExchange that while it was still maintaining its claim of being the sound recording rights owner for the 3 Disputed Songs, it was assigning THE ORCHARD (instead of itself) to be the actual payee of all future digital performance royalties collected by SoundExchange due to the business merger between IODA and THE ORCHARD.

80.      Finally, on February 11th, 2020, Ms. Clendaniel provided Plaintiff with a document establishing that between June of 2012 through as recently as May 31st of 2019, THE ORCHARD, as the assigned payee for IODA regarding the 3 Disputed Songs, has received numerous sound recording rights-ownership royalty deposits (in minimal amounts) from SoundExchange in direct connection with the non-interactive webcast usages of the 3 Disputed Songs as reported to SoundExchange by third-party Internet radio stations, including Last.FM, Live365.com, and KBAC-FM.

80(a).     KBAC-FM is an internet radio station in New Mexico that Plaintiff's manager in Illinois—not IODA or THE ORCHARD—had personally distributed 1 of the 3 Disputed Songs ("Moat Around Your Heart") to as a single back in 2007 in connection with a radio promotion campaign for the song.   Per documentation provided to Plaintiff by SoundExchange and Plaintiff's conversations with current employees of the station, KBAC-FM's program director (Ira Gordon) played the song in early 2019 prior to his retirement from the station.   As such, THE ORCHARD's receipt

of a royalty deposit from SoundExchange in connection with these reported usages by KBAC-FM in fact originates from a distribution made to KBAC-FM by Plaintiff's manager from Illinois—whereas, the royalties paid to THE ORCHARD by SoundExchange from usages reported by Last.FM and Live365.com originate from IODA and the ORCHARD's own unauthorized reproductions and distributions of the HII Album to those two entities.

81.     Ms. Clendaniel indicated in her emails to Plaintiff that unless IODA and THE ORCHARD relinquish their sound recording rights-ownership claim on the 3 Disputed Songs, she was/is not permitted to disclose to Plaintiff the specific amount of digital performance royalties that IODA and THE ORCHARD has received from SoundExchange in connection with the 3 Disputed Songs, or the specific dates that such royalties have been disbursed from SoundExchange since 2012, but only that such sound recordings rights ownership royalties have factually been deposited into IODA and THE ORCHARD's bank account multiple times since 2012, and that the amounts are minimal.

82.     None of the information provided to Plaintiff by Ms. Clendaniel as specified in paragraphs 78 through 81 was known to Plaintiff prior to February 4th, 2020.

83.     On February 5th, 2020, Plaintiff made yet another attempt to contact THE ORCHARD regarding the ongoing SoundExchange dispute over the sound recording rights ownership of the 3 Disputed Songs, and called THE ORCHARD at its principal place of business at 212-201-9280. In doing so, Plaintiff spoke with a female receptionist at THE ORCHARD (name unknown), briefly explained the longstanding rights-ownership dispute concerning the 3 Disputed Songs, and requested to speak with the proper person at THE ORCHARD that handles claims and disputes with copyright

owners. The receptionist advised Plaintiff that he needed to send an email outlining the dispute to the email address disputes@theorchard.com in order to have the matter reviewed.

84.     As specifically instructed over the phone by the female receptionist at THE ORCHARD as referenced in paragraph 83 herein, later in the day on February 5th, 2020, Plaintiff sent an email to disputes@theorchard.com. Therein, Plaintiff again advised that he was/is the rightful copyright owner of the compositions and sound recordings of the 3 Disputed Songs and requested an explanation and any documentation that THE ORCHARD was/is relying on to substantiate its ongoing claim of sound recording rights-ownership with SoundExchange. However, THE ORCHARD again deliberately ignored Plaintiff's email and provided no response thereto.

85.     In submitting the 3 Disputed Songs to SoundExchange for registration into SoundExchange's database on its own initiative in June of 2012 and naming itself as the sound recording rights owner entitled to 100% of any and all sound recording rights-ownership royalties in perpetuity as collected by SoundExchange, IODA unlawfully and intentionally acquired control of Plaintiff's sound recording-ownership royalty rights of which are directly connected and merged with Plaintiff's tangible property situated in the state of Illinois (sound recordings, certificate of registration and/or the Aspirion Distribution Agreement), since Plaintiff is the rightful copyright owner of the musical works and sound recordings and never authorized IODA to take such actions.

86.     In voluntarily receiving a sound recording royalty deposit (i.e. monetary funds) directly from SoundExchange (via bank deposit or check) in or about June of 2012 in

connection with digital performance usages reported to SoundExchange for the 3 Disputed Songs by third party Internet radio stations (Last.fm and Live365.com), IODA unjustly acquired monetary funds of which rightfully belonged/belongs to Plaintiff, and IODA at all times had actual and constructive knowledge that it was not the rightful owner of the sound recording ownership rights for the 3 Disputed Songs since Plaintiff (as the rightful copyright owner) had not assigned it such rights.

87.     In notifying SoundExchange in or about late June of 2012 that it was assigning all sound recording ownership royalty payee-rights to THE ORCHARD (instead of itself) for all future digital performance royalties collected by SoundExchange in connection with reported usages of the 3 Disputed Songs by third-parties, IODA unlawfully transferred control of Plaintiff's sound recording rights-ownership royalty rights of which are directly connected and merged with Plaintiff's tangible personal property situated in the state of Illinois (sound recordings, certificate of registration and/or the Aspirion Distribution Agreement), since Plaintiff is the rightful copyright owner of the musical works and sound recordings and never authorized IODA to take such action.

88.     In voluntarily receiving the assigned sound recording rights-ownership royalty-payee rights from IODA in June of 2012 on the 3 Disputed Songs without the consent or authority of Plaintiff, THE ORCHARD unlawfully and intentionally acquired control of Plaintiff's sound recording rights-ownership royalty rights of which are directly connected and merged with Plaintiff's tangible personal property situated in the state of Illinois (sound recordings, certificate of registration and/or the Aspirion Distribution Agreement), since Plaintiff is the rightful copyright owner of the musical

works and sound recordings and THE ORCHARD had actual knowledge that Plaintiff (as the rightful copyright owner) had never authorized such an action.

89.     In voluntarily receiving numerous sound recording rights-ownership royalties (i.e. monetary funds) directly from SoundExchange (via bank deposit and/or checks) between June of 2012 and at least May 31st of 2019 in direct connection with digital performance usages reported to SoundExchange for the 3 Disputed Songs by third party Internet radio stations/webcasters (Last.fm, Live365.com and KBAC-FM), THE ORCHARD unjustly acquired monetary amounts of which rightfully belonged/belongs to Plaintiff, and THE ORCHARD at all times had actual knowledge that it was not the rightful owner of the sound recording rights-ownership royalty rights, nor of the monetary funds received from SoundExchange for reported usages of the 3 Disputed Songs, since Plaintiff (as the rightful copyright owner) had not assigned it such rights.

90.     Both IODA and THE ORCHARD have received each of their respective royalty deposits from SoundExchange as directly relating to the 3 Disputed Songs voluntarily, and also despite at all times intentionally ignoring Plaintiff's written inquiries/requests of which questioned the basis of their ownership contention, and while also having actual and constructive knowledge that they are not the rightful owner of the sound recordings or the royalty rights for the 3 Disputed Songs.

91.     The specific monetary amounts of sound recording rights ownership royalties factually received by both IODA and THE ORCHARD as paid by SoundExchange is currently unknown to Plaintiff due to the reasons specified in paragraph 81 herein.

92.     In jointly refusing to relinquish their sound recording rights ownership claim with SoundExchange at all times since at least February 13th of 2018 as specified in paragraph

62 herein, and by jointly ignoring Plaintiff's certified letter as received on December 16th, 2019 of which had explicitly requested such relinquishment as specified in paragraph 74 herein, as well ignoring as all other written communications from Plaintiff, Defendants IODA and THE ORCHARD have intentionally deprived Plaintiff of his sound recording ownership right to collect any future sound recording rights-ownership royalties for the 3 Disputed Songs that may be generated from their future digital broadcasts by third-parties and of which are collected and paid by SoundExchange.

93.     Further, in jointly refusing to relinquish their sound recording rights ownership claim with SoundExchange at all times since at least February 13th of 2018 as specified in paragraph 62 herein, and by jointly ignoring Plaintiff's certified letter as received on December 16th, 2019 of which had explicitly requested such relinquishment as specified in paragraph 74 herein, as well ignoring as all other written communications from Plaintiff, Defendants IODA and THE ORCHARD have reasonably deprived Plaintiff of the full use and fair market value of his sound recordings for the 3 Disputed Songs in that any efforts or expenses that Plaintiff could have undertaken (or might undertake) to promote the 3 Disputed Songs to digital broadcast formats such as satellite and Internet radio would have been (and still would be) mostly futile since Plaintiff would have been (and still would be) unable to collect the sound recording rights-ownership royalties from SoundExchange in light of the ongoing rights ownership dispute between himself and Defendants.

94.      In jointly ignoring and failing to comply with Plaintiff's certified letter as received on December 16th, 2019 of which had explicitly requested the return of any and all sound recording royalties ever received from SoundExchange in connection with the 3 Disputed

Songs—regardless of the amount—Defendants IODA and THE ORCHARD have intentionally deprived Plaintiff of monetary sums of which they were/are not lawfully entitled to collect and withhold, since Plaintiff is the rightful and exclusive copyright owner of the sound recordings and never assigned any of his royalty rights to Defendants.

95.     IODA and THE ORCHARD'S intentional conduct in acquiring and maintaining control over Plaintiff's sound recording-ownership royalty rights over the course of the last two years as stated herein Plaintiff's First Claim For Relief, while also ignoring each of Plaintiff's written communications concerning the subject, has proximately caused Plaintiff undue emotional distress, including emotional distress with transient manifestations of physical symptoms, such as insomnia, heightened blood pressure, and stomach distress, of which Defendants are liable.

**SECOND CLAIM FOR RELIEF – DIRECT COPYRIGHT INFRINGEMENT AGAINST DEFENDANTS IODA AND THE ORCHARD**

96.      Plaintiff re-alleges and incorporates the statements and allegations contained in all of the preceding paragraphs as if fully set forth at length herein.

97.     Defendants IODA and THE ORCHARD have separately, without any license whatsoever, intentionally reproduced, distributed and/or otherwise made available to third-parties for further reproduction, distribution and performance, Plaintiff's 11 copyrighted compositions and sound recordings (i.e. the HII Album as set forth on Exhibit A hereto).

98.     Upon documentation first provided to Plaintiff by SoundExchange employee Erin Clendaniel on February 11th, 2020, at some point prior to January of 2011 Defendant IODA obtained a copy (either physical or digital) of Plaintiff's HII Album and uploaded

each of its 11 songs onto its own computer servers. Upon information and belief, IODA thereafter reproduced digital MP3 copies of the entire HII Album and distributed the digital copies to third-party Internet radio stations Live365.com and Last.fm.

99.    Pursuant to the specific documentation provided to Plaintiff by SoundExchange employee Ms. Clendaniel on February 11th, 2020, both Live365.com and Last.fm publicly webcasted (i.e. performed) the reproduced sound recordings for each of the "3 Disputed Songs" from the HII Album at various points in time between 2010 and May of 2014 through their respective non-interactive radio stations.

100.    The sound recording rights-ownership royalties (i.e. monetary sums) collected by SoundExchange for these specific webcast usages of each the 3 Disputed Songs by Last.fm and Live365.com were then paid by SoundExchange to Defendants IODA and THE ORCHARD between June of 2012 and December of 2014 (as set forth in Plaintiff's First Claim For Relief herein)—and possibly even after December of 2014.

101.    Upon information and belief, THE ORCHARD reproduced and distributed a digital copy of the entire HII Album (as MP3's) to an interactive music streaming service called Gaana.com (formally Gamma Gaana LTD), of which is based in India. According to Gaana's website (Gaana.com), Gaana is the #1 Music App in India offering customers "free unlimited access" to over 30 million songs via streaming and "limited downloads."

102.    On March 13th, 2020, Plaintiff was informed by a representative of Gaana.com that each of the 11 songs from the HII Album (and 11 other currently unknown songs of Plaintiff's) are available for interactive streaming, as well as for "limited download" through the Gaana mobile app exclusively for users based in India. This is also confirmed by screenshots taken by Plaintiff on March 11th, 2020 as can be seen below:



103.    Finally, in February of 2020, Plaintiff was informed by his father (Frank Martino, an Illinois resident) that he'd just discovered that a music venue/retail store located in Goshen, Indiana (Ignition Music Garage) was selling Plaintiff's HII Album through its respective online website (www.ignitionmusic.net) after randomly visiting the store in person.

104.    On March 2nd, 2020, Plaintiff observed for himself that Ignition Music Garage was indeed selling the HII Album through its online website as permanent reproduced MP3 downloads; $0.99 per song, or $9.99 for the entire album.  In fact, Plaintiff's father purchased and downloaded the entire album for $9.99 as depicted in the below screenshots:



105.    Upon purchasing the HII Album through the Ignition Music Garage online store on

March 2nd, 2020, Plaintiff's father immediately received a digital receipt by email (as

also depicted in the above screenshot from Paragraph 98 herein) of which referenced that

the transaction was powered by [Defendant] MEDIANET, and thereon also provided a

customer support email of support@mndigital.com.

106.     As such, at the direct instruction of Plaintiff, Plaintiff's father sent an email

to the specified customer support email address for MEDIANET

(support@mndigital.com), and therein, inquired as to how MEDIANET had obtained the

HII Album.

107.      Later in the day on March 2nd, 2020, a representative of MEDIANET

named Jessica Smith responded by email to Plaintiff's father's email inquiry and affirmed

that MEDIANET had in fact obtained the reproduced HII Album directly from THE

ORCHARD.

108.     In order to have lawfully reproduced, licensed, and delivered any of Plaintiff's sound

recordings to a third party of whose intent was/is to itself reproduce, license and make

available such reproduced sound recordings for sale as "Permanent Downloads" to the

general public, to permit interactive streaming of the reproduced sound recordings

through websites or cellular apps, or to perform such reproduced sound recordings via

non-interactive webcasting, both IODA and THE ORCHARD must have first obtained

not only a master use license for each of the 11 individual sound recordings comprising

the HII Album from the owner(s) of each sound recording from Plaintiff, but also a

separate license for the underlying musical compositions which are embodied on each

separate sound recording of said musical compositions.

109.     Likewise, in order for any of IODA and THE ORCHARD'S music service

customers such as MEDIANET to lawfully distribute/make available, perform,

reproduce, sub-license, or deliver any sound recording of any musical work via

"Streams" or "Permanent Downloads" from its catalog, the licenses required by IODA

and THE ORCHARD, as stated in the preceding paragraph, must have first been

assignable to third parties with the consent of Plaintiff—which they were not. The master

licenses for each of the sound recordings could only have been obtained from Plaintiff,

and the licenses for each of the underlying musical compositions embodied on each

of the aforementioned sound recordings for the HII Album could have been obtained

either via a voluntary license (with the consent of Plaintiff as the copyright holder) or via

a compulsory license, the method of which is set forth in 17 U.S.C. § 115 and related

regulations of the Copyright Office.

110.      However, pursuant to 17 U.S.C. § 115, failure to serve or file the notice required

prior to distribution forecloses the possibility of a compulsory license and, in the absence

of a negotiated (voluntary) license, renders the reproduction and distribution of

phonorecords actionable as acts of infringement of Plaintiff's exclusive rights as the

copyright owner of both the musical compositions and sound recordings for each of the

11 works comprising the HII Album.

111.      A license obtained under the compulsory provision of the Copyright Act, being

non-exclusive in nature, is not assignable.

112.      As a cost-cutting business decision, Defendants IODA and THE ORCHARD

intentionally failed to serve NOIs for all of Plaintiff's 11 recordings comprising the HII

Album, and further failed to ever attempt to negotiate a master license with Plaintiff prior

to reproducing, licensing, and distributing copies of each of the sound recordings for each

of the songs on the album to the various third-parties specified herein Plaintiff's Second

Claim For Relief.  This is despite the fact that both Defendants had actual and

constructive knowledge that both licenses were necessary in order to reproduce and distribute copyrighted musical works/sound recordings to third-parties, and that to do so without a license constitutes infringement of Plaintiff's exclusive rights.

113. At no time did IODA or THE ORCHARD ever serve an Annual Statement of Account on Plaintiff as required by 37 CFR 210.16.

114. At no time did IODA or THE ORCHARD ever serve a Monthly Statement of Account on Plaintiff as required by 37 CFR 210.17.

115. At no time did IODA or THE ORCHARD ever pay Plaintiff any royalties whatsoever, and to date, Plaintiff is unaware as to which party(ies)—if any—IODA and/or the ORCHARD have ever paid any such royalties of which would be owed to Plaintiff as the copyright owner.

116. Neither IODA or THE ORCHARD are "service providers" as defined by 17 U.S.C. § 512, and therefore neither Defendant is entitled to any of the safe harbor provisions of the Digital Millennium Copyright Act.

117. Defendants' reproductions, distributions, and unauthorized licensing of each of the 11 songs on the HII Album without the payment of proper royalties is actionable as acts of infringement under section 501 of the Copyright Act and fully subject to the remedies provided by sections 502 through 506 and 509.

118. Additionally, Defendants' reproduction, distributions and unauthorized licensing without having first negotiated a master license with Plaintiff further constitutes infringement, as a master license is outside the scope of Section 115 of the Copyright Act.

119. That both IODA and THE ORCHARD have both deliberately ignored all of

Plaintiff's email and letter inquiries to date—shocks the conscience. This is particularly

so in light of both IODA and THE ORCHARD having actual and constructive knowledge

that Plaintiff's copyrighted works (i.e. the 11 works comprising the HII Album) continue

to be reproduced, performed, sublicensed and distributed by the third-party

recipients of its own unlawful reproductions, licensing and distributions.

120.     Each time that Plaintiff has been deprived of his statutory royalty entitlement by

Defendants, e.g., by non-payment of royalties and late fees, a distinct harm was done to

Plaintiff's property interest.

121.     Furthermore, Defendants' unauthorized reproductions, licensing, and distributions of

the HII Album to third-parties has reasonably caused Plaintiff to lose his right to control

distribution of his sound recordings in general, the right to control and/or regulate other

means of sale and/or public performance including via digital audio transmission, the

right to negotiate royalty rates and set prices, as well as the right to control the

reproduction of his sound recordings by third-parties.

122.     Upon information and belief, Defendants have reproduced, licensed and distributed

copies of Plaintiff's HII Album to additional third parties currently unknown to Plaintiff,

but of which Plaintiff will supplement this Complaint with upon their discovery.

123.     Defendants' predatory conduct was and is clearly intentional within the meaning

of 504(c)(2) for purposes of enhancing statutory damages. Notably, as Defendants have

operated as music distributors in the United States for a significant number of years,

Defendants possessed actual and constructive knowledge that their actions constituted an

infringement each time it failed to negotiate a master license, serve an NOI, or make a

royalty payment. Furthermore, at all times, Defendants deliberately refused to respond

or even acknowledge any of Plaintiff's attempts at communication.

124.    Defendants' knowledge of their infringements may also be inferred from their willful conduct (as hypothetically opposed to Defendants having lacked actual knowledge of their infringements), including the reckless disregard of Plaintiff' property rights. Such reckless disregard, also suffices to warrant award of the heightened statutory damages.

125.    Moreover, Defendants have made a business decision to accumulate as much music as possible into their catalogue so as to offer to third-parties—regardless if its accumulation infringes upon the copyrights of independent songwriters and artists such as Plaintiff of whom own their own sound recordings. Defendants take this prerogative because it assumes that most wholly-independent songwriters and artists do not have the financial means or legal prowess to recognize and enforce their intellectual property rights, and that even in the unlikely event of litigation, any potential monetary penalty that might be incurred from its infringements is outweighed by the business benefit of being able to market a larger catalogue of music to its customers.

126.    Pursuant to 17 U.S.C. § 504(c)(2), in lieu of actual damages, Plaintiff is entitled to elect to recover statutory damages for willful infringement of up to $150,000, but not less than $30,000, per each of the 11 songs on the HII Album of which both IODA and THE ORCHARD have independently infringed—and with each of the 11 songs having their own independent economic value.

### THIRD CLAIM FOR RELIEF – DIRECT COPYRIGHT INFRINGEMENT AGAINST DEFENDANT MEDIANET, INC.

127.    Plaintiff re-alleges and incorporates by reference each and every allegation and statement contained in the preceding paragraphs with the same force and effect as if fully

set forth at length herein.

128.     On March 2nd, 2020, Plaintiff first discovered that at some prior point in time, MEDIANET obtained a reproduced copy of Plaintiff's HII album directly from THE ORCHARD, and thereafter, uploaded (i.e. "ingested") each of the 11 songs from the HII album onto its in own computer servers so as to make the HII album part of MEDIANET'S internal music catalogue.

129.     Upon information and belief, MEDIANET obtained the copy of Plaintiff's HII Album under (an unauthorized) license from THE ORCHARD.

130.     At some prior point in time, MEDIANET also obtained a reproduced copy (either physical or digital) of Plaintiff's SD album by some currently unknown means, and thereafter, uploaded (i.e. "ingested") each of the 10 songs from the SD album onto its in own computer servers so as to make the SD album part of MEDIANET'S internal music catalogue.

131.     On March 2nd, 2020, Plaintiff first discovered that MEDIANET has itself reproduced the 11 songs from the HII Album and the 10 songs from the SD Album as digital MP3s, and then has made each of the reproduced digital MP3s part of its internal music catalogue—the catalogue of which it hosts on its own computer servers.

132.     Between March 2nd, 2020 and April, 2nd, 2020, Plaintiff first discovered that MEDIANET has intentionally distributed, sublicensed, and/or otherwise made available its reproduced MP3 copies of each of Plaintiff's 21 musical works/sound recordings to at least 53 (but reasonably believed to be over 60) separate third-party brick and mortar music retailers of which are itemized on Exhibit B attached hereto this Complaint—two of which are incorporated and principally based in the state of Illinois.  MEDIANET has

intentionally done so without obtaining any mechanical license, without ever negotiating or obtaining a master recording license from Plaintiff, without ever paying any royalties to Plaintiff, and without bothering to have ever served any Notice of Intention to Obtain a Compulsory License ("NOI")—either to Plaintiff, or to the U.S. Copyright Office—before reproducing, distributing, and/or licensing said recordings to the third-parties.

133.     MEDIANET is not a "service provider" as defined by 17 U.S.C. § 512, and therefore, is not entitled to any of the safe harbor provisions of the Digital Millennium Copyright Act.

134.      Each of the 53 third-party music retailers listed on Exhibit B are selling or have already sold Plaintiff's HII Album and Plaintiff's SD Album (21 songs between them) for $0.99 per song, or $9.99 for the entire album, directly to the general public in the United States without any geographic restriction, including to residents in Illinois prior to the initiation of this lawsuit by Plaintiff, through their respective interactive online websites, and of which Plaintiff has documented through comprehensive screenshots taken throughout March and April of 2020.  For example, the below screenshots taken by Plaintiff on March 10th, 2020 depict third-party brick and mortar retailer Purple Dog Records (located at 329 Center St. in Naperville, IL 60540) selling each of the 10 songs from the SD Album and each of the 11 songs from the HII Album through its respective online website (www.purpledogrecordsonline.com):



135.     "Portions of website licensed by MediaNet" is stated at the very bottom of

each one of the 53 third-party music retailers' respective websites.

136.     The respective website for each of the 53 third party music retailers also

permitted/permits viewers to stream short previews of each one of the songs on Plaintiff's

HII and SD Albums by simply clicking on the "play" button icon located directly next to each of the songs as can be seen in the screenshots above in paragraph 134 herein, and thus, constituting a violation of Plaintiff's performance rights under Section 106 of the Copyright Act.

137.     Upon information and belief, MEDIANET has entered into sub-licensing agreements with each of the 53 third-party brick and mortar retailers listed on Exhibit B in exchange for an upfront monetary fee, a percentage of sales on permanent downloads, or for some other financial or business benefit.  These agreements allow said retailers to offer music from MEDIANET's internal music catalogue for sale as permanent digital downloads ("DPD's) to the general public (without any geographic restrictions in the United States) directly through their respective interactive websites.

138.     However, because each one of the 53 third-party retailers listed on Exhibit B have sold/are independently selling (for commercial gain of their own) Plaintiff's HII and SD Albums to the general public in the United States as permanent downloads directly through their respective interactive websites without having negotiated a master license with Plaintiff, without serving an NOI on Plaintiff or with the U.S Copyright Office, and without paying any royalties to Plaintiff, and each sale/transmission resulting in an additional infringing reproduction and distribution, they too are independently infringing Plaintiff's exclusive rights under Section 106 of the Copyright Act, and as such, would be properly enjoined Defendants to this lawsuit.

139.     MEDIANET has also made each one of Plaintiff's 21 musical compositions/sound recordings as identified on Exhibits A and C hereto, available for performance and display via interactive streaming on its own website,

www.mndigital.com, to virtually anyone in the general public (without geographic restriction) that simply creates a free "Digital Services Provider" account on its website. Notably, once a user creates and logs into their free account on www.mndigital.com, they can then immediately stream random sections of each of Plaintiff's songs by simply clicking on the play button icons located directly next to each of the songs as can be seen in the below screenshots taken by Plaintiff on March 2nd and March 10th, 2020 respectively:





140.     At all times, MEDIANET knew that Plaintiff was the copyright owner of the

sound recordings, and in a matter of only a few minutes, MEDIANET could have simply

contacted Plaintiff directly to negotiate a master license, since after all, MEDIANET

itself inputted the SD Album's affiliated record label (Gladius Records) information and

cover artwork into its own internal music catalogue as can be seen in the screenshot

directly above in Paragraph 139 herein. Moreover, a basic Google search using the

keywords "Gladius Records" and "Tony Martino" brings up on the very first listing of the

search results a public news article (https://top40-charts.com/news.php?nid=31626&cat=)

identifying therein that Gladius Records was in fact Plaintiff's own record label.

Furthermore, Plaintiff's recordings are easily searchable by name and/or title with the

U.S Copyright Office. As such, MEDIANET had actual and/or constructive knowledge

that Plaintiff owned the sound recordings.

141.     Instead, purely as a cost-cutting business decision, MEDIANET decided to

completely disregard Plaintiff's rights and upload Plaintiff's recordings onto its computer

servers and into its music catalogue solely so as to further inflate the size of its music catalogue for general marketing purposes to third-parties (which it currently touts on its corporate website as containing over "68 million songs").

142.    Moreover, MEDIANET has made a business decision to accumulate as much music as possible into its catalogue so as to offer to third-parties—regardless if its accumulation infringes upon the copyrights of independent songwriters and artists such as Plaintiff of whom own their own sound recordings. MEDIANET takes this prerogative because it assumes that most wholly-independent songwriters and artists do not have the financial means or legal prowess to recognize and enforce their intellectual property rights, and that even in the unlikely event of litigation, any potential monetary penalty that might be incurred from its infringements is outweighed by the business benefit of being able to market a larger catalogue of music to its customers.

143.    On March 2nd, 2020, Plaintiff sent an email to MEDIANET's legal department. Therein, Plaintiff inquired as to how many third-parties MEDIANET has distributed and/or made available his recordings to, as well as a list of all third-parties that MEDIANET had distributed or was scheduled to distribute royalties to in connection with any sales of his sound recordings.

144.    In the early evening on March 2nd, 2020, general counsel for MEDIANET (Seth Goldstein) directly responded to Plaintiff's email, stating that MEDIANET would look into the matter and get back to Plaintiff "shortly." However, as of the date of this filing, Plaintiff has received no further communication from MEDIANET, while at the same time MEDIANET continues its infringements.

145.     Pursuant to 17 U.S.C. § 504(c), as a direct and proximate result of MEDIANET's

willful infringements of Plaintiff's copyrighted recordings, Plaintiff is entitled to recover up to $150,000 in statutory damages per each one of the 21 musical works/sound recordings it has infringed, with each of the 21 works have an independent economic value.

146.    MEDIANET is also causing, and unless enjoined by the Court, will continue to cause, Plaintiff irreparable harm. Plaintiff is therefore entitled to an injunction under 17 U.S.C. § 502 prohibiting the continued infringement of his recordings, and an order under 17 U.S.C. § 503 directing the impoundment, destruction or other reasonable disposition of all infringing phonorecords and copies of such recordings.

**FOURTH CLAIM FOR RELIEF – CONTRIBUTORY AND VICARIOUS COPYRIGHT INFRINGEMENT AGAINST DEFENDANTS IODA AND THE ORCHARD ENTERPRISES, INC.**

147.    Plaintiff re-alleges and incorporates by reference each and every allegation and statement contained in the preceding paragraphs with the same force and effect as if fully set forth at length herein.

148.    At all times, both IODA and THE ORCHARD had actual and constructive knowledge that they did not have either a compulsory or master use license, nor any other consent from Plaintiff, to reproduce, distribute, license, and/or otherwise make available Plaintiff's HII Album to third-parties, including Last.fm, Live365.com, Gaana.com, to Defendant MEDIANET, or to any other third-party.

149.    Nevertheless, IODA and THE ORCHARD directly encouraged and actually assisted in the infringements by third-parties, including Last.fm, Live365.com, Gaana.com, and Defendant MEDIANET, by reproducing, distributing and/or licensing (without Plaintiff's authorization) Plaintiff's HII Album directly to said parties—and all

third-parties of which themselves have infringed Plaintiff's exclusive rights under Section 106 of the Copyright Act by either reproducing, distributing, sublicensing, and/or performing Plaintiff's copyrighted sound recordings without a license or paying any royalties in violation of Section 115 of the Copyright Act, as well as without having negotiated a master license with Plaintiff.

150.    IODA and THE ORCHARD willfully assisted (via reproduction, distributions and unauthorized licensing) in the infringements committed by the third-parties referenced in paragraph 149 herein, because IODA and THE ORCHARD derived/derives a financial benefit or some other business-related benefit in return from said third-parties, including from any sales of Plaintiff's HII Album as made by the retailers listed on Exhibit B hereto.

151.    At all times, IODA and THE ORCHARD knew that by reproducing, distributing and/or licensing Plaintiff's HII Album directly to the third-parties referenced in paragraph 149 herein, that there was a high probability that said third-parties would also infringe Plaintiff's exclusive rights in the HII Album by the very nature of the businesses that the third-parties are primarily engaged (i.e. music streaming, music webcasting, and music distribution).

152.    As a result of the foregoing, Defendants IODA and THE ORCHARD are liable for contributorily infringing Plaintiff's copyrighted recordings, in violation of Sections 106 and 501 of the Copyright Act.

153.    Furthermore, THE ORCHARD is also vicariously liable for infringement because it had the right to control the infringing activity of Live365.com, Last.Fm, Gaana.com and MEDIANET.   First, as the unauthorized distributor/licensor of Plaintiff's HII

Album to said parties, it could have declined to have distributed/licensed the album to those parties to begin with. Second, it could have averted any further infringements committed by Gaana.com and MEDIANET after being aware in writing by Plaintiff as early as June 27th, 2018 (previously set forth in paragraph 68 herein) that Plaintiff was questioning its basis for claiming rights ownership (through SoundExchange) over the 3 Disputed Songs on the HII Album, as well as at all times thereafter in which Plaintiff had attempted to correspond in writing and over the phone regarding the 3 Disputed Songs. Instead, THE ORCHARD deliberately ignored Plaintiff's written and telephone communications and allowed Plaintiff's HII Album to remain on Gaana.com and in MEDIANET'S possession.

154.    Additionally, THE ORCHARD could have imposed geographic restrictions on MEDIANET when it licensed (without authorization) Plaintiff's HII Album to MEDIANET as it specifically concerns the scope of where MEDIANET could in turn reproduce, distribute and/or sublicense the HII Album. Instead, however, THE ORCHARD imposed no such restriction on MEDIANET, and as a result, MEDIANET sub-licensed Plaintiff's HII Album to each of the 53 separate retailers listed on Exhibit B (including 2 retailers of which are principally based and incorporated in Illinois) in a manner of which allowed for each retailer to sell/transmit permanent downloads of the album to buyers located in any U.S. state — including to buyers located in Illinois.

155.    THE ORCHARD'S failure to impose geographic restrictions on MEDIANET while at the same deriving a financial benefit from MEDIANET's unauthorized sub-licensing of Plaintiff's HII Album, indicates THE ORCHARD's willingness to transact, profit or

otherwise derive a financial or business benefit from sales made anywhere in the United States—including sales actually made to Illinois residents.

156.    Each act of copyright infringement referenced herein was willful within the meaning of 17 U.S.C. 101, et seq.

157.    Plaintiff has suffered economic damage and irreparable harm as a result of the continuing acts of infringement referenced herein, and unless and until Defendants' conduct is enjoined by this Court, Defendants will continue to cause irreparable injury, and Plaintiff is accordingly entitled to an injunction pursuant to 17 U.S.C. § 502 prohibiting further infringement of his exclusive rights under the Copyright Act.

158.    Plaintiff is entitled to statutory damages pursuant to 17 U.S.C. § 101, et seq.

159.    Plaintiff is further entitled to his attorneys' fees (if incurred in this action) and costs pursuant to 17 U.S.C. § 505.

**FIFTH CLAIM FOR RELIEF – CONTRIBUTORY AND VICARIOUS COPYRIGHT INFRINGEMENT AGAINST DEFENDANT MEDIANET, INC.**

160.    Plaintiff re-alleges and incorporates by reference each and every allegation and statement contained in the preceding paragraphs with the same force and effect as if fully set forth at length herein.

161.    At all times, MEDIANET had actual and constructive knowledge that it did not have either a compulsory or master use license, nor any other consent from Plaintiff, to reproduce, distribute, sub-license and/or otherwise make available Plaintiff's HII and SD Albums to the 53 separate third-parties listed on Exhibit B hereto, or to any other third-party not yet known to Plaintiff.

162.    Nevertheless, MEDIANET directly encouraged and actually assisted in the

infringements by each of the third-parties listed on Exhibit B, by reproducing, distributing, sub-licensing and/or otherwise making available Plaintiff's HII and SD Albums directly to said parties—and all third-parties of which themselves have infringed Plaintiff's exclusive rights under Section 106 of the Copyright Act by offering each of Plaintiff's 21 copyrighted songs for sale to the general public of the United States (without geographic restriction) for permanent digital download through their respective websites without a license or paying any royalties to Plaintiff in violation of Section 115 of the Copyright Act, as well as without having negotiated a master license with Plaintiff.

163.    MEDIANET willfully assisted (via reproduction and distributions) in the infringements committed by the third-parties listed on Exhibit B hereto, because MEDIANET derived/derives a financial benefit in the form of upfront licensing fees, a percentage of revenues from any sales of permanent downloads, or some other business-related benefit.

164.    At all times, MEDIANET knew that by reproducing, distributing, sub-licensing and/or otherwise making available Plaintiff's HII and SD Albums directly to the third-parties listed on Exhibit B hereto, that there was a high probability that said third-parties would also infringe Plaintiff's exclusive rights in the HII and SD Albums by the very nature of the businesses that said third-parties are primarily engaged (i.e. retailers of music to the general public).

165.    MEDIANET voluntarily entered into sub-licensing agreements with each of the 53 retailers listed on Exhibit B hereto, including 2 of which are principally based and incorporated in the state of Illinois.  Through those agreements, it has permitted each of the 53 parties to freely sell/transmit the music from its music catalogue as permanent

digital downloads reproduced directly from its computer servers—including Plaintiff's HII and SD Albums — to the general public of the United States without any geographic restrictions.

166.     Moreover, if it wanted, MEDIANET could have implemented geographic restrictions on the 53 retailers listed on Exhibit B that it has licensed/sub-licensed its music catalogue to so that said retailers could only sell/transmit permanent downloads (including Plaintiff's recordings) to buyers located in their own respective states or regions, as opposed to currently allowing for sales/transmissions of permanent downloads to buyers in any U.S. state—including Illinois.   It's failure to have done so establishes MEDIANET'S willingness to permit its licensees to sell in every U.S state, including Illinois, and in fact, certain retailers listed on Exhibit B have sold and transmitted digital copies of Plaintiff's recordings to Illinois residents.

167.     In fact, MEDIANET *has* voluntarily set international restrictions on the 53 retailers listed on Exhibit B.   Notably, on April 20th, 2020 Plaintiff was sent a computer screenshot taken in April 2020 by one of his associates based in Russia of which depicts the website (www.purpledogrecordsonline.com) of retailer Purple Dog Records located at 329 Center St. in Naperville, IL, and establishes thereon that Plaintiff's SD Album is restricted from MP3 purchase outside of the United States as seen directly below:



168.  At all times, MEDIANET possessed and still possesses the right and ability to supervise and/or derail the continued infringing of Plaintiff's sound recordings by each of the 53 third-parties listed on Exhibit B hereto, by fact that MEDIANET'S own computer servers host Plaintiff's sound recordings of which said third-parties are directly selling the reproduced MP3's from to the general public through their respective individual websites.   More specifically, had MEDIANET not uploaded Plaintiff's songs onto its servers and continue to maintain them on its servers, said third-parties would not have been able/would not be able to sell/reproduce/distribute Plaintiff's songs to the general public as permanent digital phonorecord deliveries (i.e. MP3's).

169.  As a result of the foregoing, Defendant MEDIANET is liable for contributorily infringing Plaintiff's copyrighted recordings, in violation of Sections 106 and 501 of the Copyright Act.

170.  MEDIANET is also vicariously liable for the past and ongoing infringements of Plaintiff's HII and SD albums by each of the 53 third-parties listed on Exhibit B hereto,

56

and potentially other third-parties of which Plaintiff is currently unaware—all third-parties of which MEDIANET had/has the right to control, and all of which would be properly enjoined Defendants to this suit or named as Defendants in other suits brought by Plaintiff.

171. Each act of copyright infringement referenced herein was willful within the meaning of 17 U.S.C. 101, et seq.

172. Plaintiff has suffered economic damage and irreparable harm as a result of the continuing acts of infringement referenced herein, and unless and until Defendants' conduct is enjoined by this Court, Defendants will continue to cause irreparable injury, and Plaintiff is accordingly entitled to an injunction pursuant to 17 U.S.C. § 502 prohibiting further infringement of his exclusive rights under the Copyright Act.

173. Plaintiff is entitled to statutory damages pursuant to 17 U.S.C. § 101, et seq.

174. Plaintiff is further entitled to his attorneys' fees (if incurred in this action) and costs pursuant to 17 U.S.C. § 505.

**WHEREFORE,** having stated his causes of action, Plaintiff prays for judgment as follows:

A. An injunction pursuant to 17 U.S.C. §502 providing:

"Defendants IODA, THE ORCHARD ENTERPRISES, INC., and MEDIANET, INC., shall be and hereby are enjoined from directly, indirectly or derivatively infringing Plaintiff s rights under federal or state law in the HII Album, the SD Album, the 3 Disputed Songs, or any other sound recording, whether now in existence or later created, that is owned or controlled by Plaintiff (or any parent, subsidiary, or affiliate record label of Plaintiff) ("Plaintiff s Recordings), including without limitation by using the Internet

or any online media distribution system to distribute (i.e., upload) any of Plaintiff s sound recordings, or to make any of Plaintiff s sound recordings available for distribution to any third party or the public generally, except pursuant to a lawful license or with the express authority of Plaintiff. Defendants shall also destroy all copies of Plaintiff s sound recordings that Defendants may have currently saved on any computer hard drive or server, and shall destroy all copies of those downloaded recordings transferred onto any physical medium or device in Defendant's possession, custody, or control. Defendants shall further instruct all of its distribution partners or recipients of its past distributions to cease any further sales, reproductions, performances, or distributions of Plaintiff's sound recordings."

B.     Statutory damages of $150,000, but in no case less than $30,000, against IODA per each one of Plaintiff's 11 Copyrighted compositions and respective sound recordings on the HII Album that it willfully infringed, or for such other amount as may be proper pursuant to 17 U.S.C. §504(c);

C.     Statutory damages of $150,000, but in no case less than $30,000, against THE ORCHARD per each one of Plaintiff's 11 Copyrighted compositions and respective sound recordings on the HII Album that it willfully and separately infringed, or for such other amount as may be proper pursuant to 17 U.S.C. §504(c);

D.     Statutory damages of $150,000, but in no case less than $30,000, against MEDIANET, INC., per each one of Plaintiff's 11 copyrighted compositions and respective sound recordings on the HII Album, and per each one of Plaintiff's 10 copyrighted compositions and respective sound recordings on the SD Album that it willfully and separately infringed, or for such other amount as may be proper as pursuant

to 17 U.S.C. §504(c);

E.      Compensatory damages against IODA and THE ORCHARD in the amount of $105,251 for conversion, including emotional distress with the manifestation of physical symptoms; sound recording rights-ownership royalties unjustly received from SoundExchange and never returned to Plaintiff in connection with the 3 Disputed Songs; loss of Plaintiff's right to collect future sound recording rights ownership royalties from SoundExchange for the 3 Disputed Songs; and the loss of full use and value of Plaintiff's sound recordings for the "3 Disputed Songs".

F.      Punitive damages against IODA and THE ORCHARD for conversion;

G.      Plaintiff s costs in this action;

H.      Plaintiff s reasonable attorney's fees if incurred in this action;

I.      Such other and further relief as the Court may deem just and proper.


                                          Respectfully submitted,

                              By:   /s/Anthony Martino
                                          Anthony Martino
                                          P.O Box 5558
                                    Buffalo Grove, IL 60089
                                    tony@tonymartinomusic.com
                                          847-977-4128

## **JURY DEMAND**

Plaintiff, Anthony Martino, hereby demands a trial by jury on all claims in this action so triable.

Respectfully submitted,

By: /s/Anthony Martino
P.O Box 5558
Buffalo Grove, IL 60089
tony@tonymartinomusic.com
847-977-4128

# EXHIBIT A

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, United States Code, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marybeth Peters*

Register of Copyrights, United States of America



**Form SR**
For a Sound Recording
UNITED STATES COPYRIGHT OFFICE

REGISTRATION NUMBER

**SRu 628 – 333**

=SRU00628U333=

EFFECTIVE DATE OF REGISTRATION

7 – 31 – 06

Month    Day    Year

---

DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.

**1** TITLE OF THIS WORK ▼

Hope IN Isolation (Mastered version)

PREVIOUS, ALTERNATIVE, OR CONTENTS TITLES (CIRCLE ONE) ▼

5) Faces change 1) Growing pains 2) Note To self 3) Love Extinguisher 4) Meet Aront Your Heart 6) Just Dont Know 7) Remember Me 8) More Than Youre Known 9) The world outside 10) Re-Ignition 11) Hope in

**2** a NAME OF AUTHOR ▼

Anthony Martino

DATES OF BIRTH AND DEATH
Year Born ▼  Year Died ▼
1983

Was this contribution to the work a "work made for hire"?
☐ Yes
☒ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of ▶ United States
Domiciled in ▶

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous? ☐ Yes ☒ No
Pseudonymous? ☐ Yes ☒ No
If the answer to either of these questions is "Yes," see detailed instructions.

NATURE OF AUTHORSHIP Briefly describe nature of material created by this author in which copyright is claimed. ▼

Words AND Music

**NOTE**
Under the law, the "author" of a "work made for hire" is generally the employer, not the employee (see instructions). For any part of this work that was "made for hire," check "Yes" in the space provided, give the employer (or other person for whom the work was prepared) as "Author" of that part, and leave the space for dates of birth and death blank.

b NAME OF AUTHOR ▼

DATES OF BIRTH AND DEATH
Year Born ▼  Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of ▶
Domiciled in ▶

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous? ☐ Yes ☐ No
Pseudonymous? ☐ Yes ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

NATURE OF AUTHORSHIP Briefly describe nature of material created by this author in which copyright is claimed. ▼

c NAME OF AUTHOR ▼

DATES OF BIRTH AND DEATH
Year Born ▼  Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of ▶
Domiciled in ▶

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous? ☐ Yes ☐ No
Pseudonymous? ☐ Yes ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

NATURE OF AUTHORSHIP Briefly describe nature of material created by this author in which copyright is claimed. ▼

**3** a YEAR IN WHICH CREATION OF THIS WORK WAS COMPLETED
2006 ◀ Year
This information must be given in all cases.

b DATE AND NATION OF FIRST PUBLICATION OF THIS PARTICULAR WORK
Complete this information ONLY if this work has been published.
Month ▶    Day ▶    Year ▶    ◀ Nation

**4** a COPYRIGHT CLAIMANT(S) Name and address must be given even if the claimant is the same as the author given in space 2. ▼

Anthony Martino
580 Vernon Lane
Buffalo Grove, IL 60089

APPLICATION RECEIVED
JUL 3 1 2006
ONE DEPOSIT RECEIVED
JUL 3 1 2006
TWO DEPOSITS RECEIVED
FUNDS RECEIVED

b TRANSFER If the claimant(s) named here in space 4 is (are) different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright. ▼

See instructions before completing this space.

DO NOT WRITE HERE OFFICE USE ONLY

| EXAMINED BY | *D61* | FORM SR |
|---|---|---|
| CHECKED BY | | |

CORRESPONDENCE
□ Yes

FOR
COPYRIGHT
OFFICE
USE
ONLY

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**PREVIOUS REGISTRATION** Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office?

□ Yes ☒ No  If your answer is "Yes," why is another registration being sought? (Check appropriate box) ▼

a. □ This work was previously registered in unpublished form and now has been published for the first time.
b. □ This is the first application submitted by this author as copyright claimant.
c. □ This is a changed version of the work, as shown by space 6 on this application.

If your answer is "Yes," give: Previous Registration Number ▼          Year of Registration ▼

**5**

**DERIVATIVE WORK OR COMPILATION**
Preexisting Material  Identify any preexisting work or works that this work is based on or incorporates. ▼

**a**

Material Added to This Work  Give a brief, general statement of the material that has been added to this work and in which copyright is claimed. ▼

**b**

**6**

See instructions
before completing
this space.

**DEPOSIT ACCOUNT** If the registration fee is to be charged to a deposit account established in the Copyright Office, give name and number of Account.
Name ▼                                    Account Number ▼

**a**

**CORRESPONDENCE** Give name and address to which correspondence about this application should be sent.  Name/Address/Apt/City/State/Zip ▼

**b**
Anthony Martino
580 Vernon Lane
Buffalo Grove, IL 60089

Area code and daytime telephone number  847-977-4138          Fax number
Email  Hemitman@ Atl.com

**7**

**CERTIFICATION\*** I, the undersigned, hereby certify that I am the

Check only one ▼
☒ author
□ other copyright claimant
□ owner of exclusive right(s)
□ authorized agent of

*Anthony Martino*
Name of author or other copyright claimant, or owner of exclusive right(s) ▲

of the work identified in this application and that the statements made by me in this application are correct to the best of my knowledge.

Typed or printed name and date ▼ If this application gives a date of publication in space 3, do not sign and submit it before that date.

Anthony Martino                    Date  7/21/06

Handwritten signature (x)
x___ *Anthony Martino* ___

**8**

Certificate
will be
mailed in
window
envelope
to this
address

Name ▼
Anthony Martino
Number/Street/Apt ▼
580 Vernon Lane
City/State/Zip ▼
Buffalo Grove, IL 60089

YOU MUST:
• Complete all necessary spaces
• Sign your application in space 8
SEND ALL 3 ELEMENTS
IN THE SAME PACKAGE
1. Application form
2. Nonrefundable filing fee in check or money
   order payable to Register of Copyrights
3. Deposit material
MAIL TO:
Library of Congress
Copyright Office
101 Independence Avenue SE
Washington, DC 20559-6000

**9**

\*17 USC §506(e): Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection with the application, shall be fined not more than $2,500.

Form SR  Rev: 07/2006  Print: 07/2006—xx,000  Printed on recycled paper          U.S. Government Printing Office: 2005-xxx-xxx/60,xxx

**EXHIBIT B**

**List of MediaNet, Inc's Distribution Recipients of Plaintiff's 21 Musical Works/Sound Recordings**

1.) Darkside Records (Poughkeepsie, NY)
2.) Purple Dog Records (Naperville, IL)
3.) Salzers Records (Ventura, CA)
4.) Records With Merritt (Kansas City, MO)
5.) Easy Street Records (Seattle, WA
6.) Mills Record Company (Kansas City, MO)
7.) Street Light Records (San Jose, CA and Santa Cruz, CA)
8.) Music Millennium (Portland, OR)
9) Strictly Discs (Madison, WI)
10.) DBS Sounds (Riverdale, GA)
11.) The Sound Garden (Baltimore, MA and Syracuse, NY)
12.) Tunes Online (Vorhees, NJ)
13.) Wooden Nickel Records (Fort Wayne, IN)
14.) Waterloo Records (Austin, TX)
15.) Magnolia Thunderpussy (Columbus, OH)
16.) The Long Ear (Coeur D'Alene, ID)
17.) We Got The Beats (Oakland Park, FL and Lauderhill, FL
18.) Young Ones Records (Kutztown, PA)
19.) Schoolkids Records (Raleigh, NC and Chapel Hill, NC)
20.) Park Ave. CD's (Orlando, FL)
21.) Plan 9 Records (Richmond, VA and Charlottesville, VA)
22.) Omega Music (Dayton, OH)
23.) OZ Music (Tuscaloosa, AL)
24.) Monster Music and Records (Charleston, SC)
25.) Main Street Music (Philadelphia, PA)
26.) Ignition Music Garage (Goshen, IN)
27.) The Great Escape (Nashville, TN, Murfreesboro, TN, Madison, TN, and Bowling Green, KY)
28.) Finders Records (Bowling Green, OH)
29.) Gallery Of Sound (Dickson City, PA, and Wilkes-Barre- PA)
30.) Armadillo Music (Davis, CA)
31.) Down In The Valley (Crystal, MN, Minneapolis, MN, and Maple Grove, MN)
32.) Dearborn Music (Dearborn, MI)
33.) Dr. Music Records (Fairhope, AL)
34.) Electric Fetus (Minneapolis, MN and Duluth, MN)
35.) Gimme Gimme Records (Los Angeles, CA)
36.) Lavender Vinyl (Ogden, UT)
37.) Siren Records (Doylestown, PA)
38.) Pure Pop Records (Burlington, VT)
39.) The Groove Nashville (Nashville, TN)
40.) Sound & Vision Vinyl (Salt Lake City, UT)
41.) Horizon Records (Greenville, SC)
42.) Daddy Kool Records (St. Petersburg, FL)
43.) The Telegraph New London (New London, CT)
44.) Remix Record Shop (Orlando, FL)
45.) Greenlight Music (Kalamazoo, MI)
46.) Obsession Records (Anchorage, AK)
47.) Cactus Records (Bozeman, MT)
48.) South Town Vinyl (San Antonio, TX)
49.) Randy's Record Shop (Salt Lake City, UT)
50.) Main Street Vinyl (Hamilton, OH)
51.) Siren Records McHenry (McHenry, IL)
52.) Discovery Records (Cape Girardeau, MO)
53.) Everybody's Records (Cincinnati, OH)

# EXHIBIT C

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Maria A. Pallante*

Acting Register of Copyrights, United States of America

**Registration Number**

## SRu 982-184

**Effective date of registration:**

June 10, 2009

---

## Title

**Title of Work:** "Slightly Defined" 2009 Album Release (10 songs)

## Completion/Publication

**Year of Completion:** 2009

## Author

■      **Author:** Anthony F. Martino, dba Tony Martino

**Author Created:** Music, Lyrics, Sound recording/performance

**Citizen of:** United States

**Year Born:** 1983

## Copyright claimant

**Copyright Claimant:** Anthony F. Martino, dba Tony Martino

580 Vernon Lane, Buffalo Grove, IL, 60089, United States

## Rights and Permissions

**Name:** Anthony F. Martino

**Email:** hemitman@aol.com      **Telephone:** 847-977-4128

**Address:** 580 Vernon Lane

Buffalo Grove, IL 60089 United States

## Certification

**Name:** Anthony Martino

**Date:** May 24, 2009

---

**Registration #:**   SRU000982184

**Service Request #:**   1-213762676



Anthony F. Martino
580 Vernon Lane
Buffalo Grove, IL 60089  United States